TAB A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SURVEYS & ANALYSIS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SCOTT HULTINE, <br><br> Defendant. | C.A. No. 04-CV-40195-FDS |

## AFFIDAVIT OF SCOTT HULTINE

I, Scott Hultine, on my oath do hereby depose and state as follows:

1. My name is Scott Hultine. I live at 628 Forest View Drive in Geneva, Illinois. I have personal knowledge of the facts presented in this affidavit.

2. From or about March 10, 1997, to on or about July 9, 2002, I worked for Surveys & Analysis, Inc. ("Surveys"). I was hired as a natural gas leak inspector. I was hired in Illinois. I worked out of my home in Geneva, Illinois.

3. During my employment with Surveys, I provided leak detection services to Nicor Gas ("Nicor"). Nicor is a natural gas provider that distributes gas to customers in northern Illinois. Nicor is an Illinois corporation with its principal place of business in Naperville, Illinois.

4. I did not travel to Massachusetts for business during my employment with Surveys. I did not conduct any business in Massachusetts. The work that I did for Surveys was performed exclusively in Illinois.

5. During my employment, Surveys employed between two and approximately fifteen employees in Illinois. The number of Surveys' employees who worked in Illinois varied depending on the volume of work in Illinois. Surveys continues to conduct business in Illinois.

6. On or about April 16, 1999, I signed an Employment, Nondisclosure & Non-Competition Agreement ("the Agreement"). I did not have the opportunity to negotiate the Agreement. I signed the Agreement in Illinois.

7. On or about July 9, 2002, Surveys terminated my employment.

8. Following the termination of my employment, I began working for A.G.D., Inc. ("AGD"). AGD performs leak surveys for natural gas suppliers. AGD is an Illinois corporation with its principal place of business in Geneva, Illinois. I am the Vice President of AGD. My wife, Rebecca Hultine, is the President of AGD.

9. I do not perform any work in Massachusetts in connection with my employment with AGD. AGD does not conduct business in Massachusetts.

10. On September 27, 2004, I filed a complaint against Surveys in the United States District Court for the Northern District of Illinois, Eastern Division. That case is captioned *Scott Hultine v. Surveys & Associates, Inc.*, C.A. No. 04 C 6248 (Judge Kocoras). I have attached a copy of the complaint at Tab 1.

11. I am a defendant in a lawsuit filed by Surveys in Massachusetts. That case is captioned *Surveys & Analysis, Inc. v. Scott Hultine* and is pending in the United States District Court for the District of Massachusetts, Worcester Division, C.A. No. 04-CV-40195-FDS (Judge Saylor). In its complaint, Surveys alleges, among other things, that I violated the Agreement when I performed work for Nicor in Illinois after Surveys terminated my employment.

12. In connection with the defense of claims brought against me by Surveys, I will testify at trial. I expect to testify about the circumstances of the signing of the Agreement, my employment with Surveys, Surveys' poor service to Nicor, and my business activities with Nicor after Surveys terminated my employment.

13. I expect that I will require the testimony of other witnesses. I have listed below the names of those expected witnesses, the expected areas of testimony, and their residences:

| *Name and Position* | *Expected Areas of Testimony* | *Residence* |
|---|---|---|
| Rebecca Hultine (President, AGD, Inc.) | Establishment of AGD. Negotiations between AGD and Nicor. Work performed by AGD for Nicor. | Geneva, Illinois |
| Steve Knowlton (Former employee of Surveys and current AGD employee) | Termination of Mr. Hultine's employment. Nature of business information provided by Surveys to its employees. Work performed for Nicor by AGD and Surveys for Nicor. | St. Charles, Illinois |
| Andre Zwerschke (Former employee of Surveys and current AGD employee) | Nature of business information provided by Surveys to its employees. Work performed for Nicor by Surveys and AGD. | Westmont, Illinois |
| Paul Qualiato (Program Administrator, Nicor) | Work performed for Nicor by both Surveys and AGD. Nicor's concerns about services provided by Surveys. Public safety issues concerning natural gas distribution and the importance of leak surveys. Nicor's decision to hire AGD. | Downers Grove, Illinois |
| Somali Tomczak (Code Compliance Department, Nicor) | Work performed for Nicor by both Surveys and AGD. Nicor's concerns about services provided by Surveys. Public safety issues concerning natural gas distribution and the importance of leak surveys. Nicor's decision to hire AGD. | Naperville, Illinois |
| Roy Rodriguez (Field Test/Auditor, Nicor) | Work performed for Nicor by both Surveys and AGD. | Lansing, Illinois |
| Patty McKibbon (Trainer, Nicor) | Work performed for Nicor by AGD. | Illinois (town unknown) |

14.     Given that I live in Geneva, Illinois and the key witnesses live in Illinois, the federal court in the Northern District of Illinois would be more convenient for me and my witnesses.

15.     Some of my witnesses are currently AGD employees. AGD has eighteen employees, including my wife and me. Two of these employees are part-time. All of AGD's employees live in Illinois.

16.     Leak surveys work is time-sensitive, and the work must be completed within strict timelines set by law. If AGD employees travel from Illinois to Massachusetts to serve as witnesses in this case, AGD's business will be disrupted. Additionally, because I oversee and direct the work of AGD's employees, my travel to Massachusetts will further disrupt AGD's business operations.

17.     The cost of travel from Illinois to Worcester, Massachusetts, and the associated lodging expenses, would be substantial given my financial status. When my employment with Surveys ended, I was earning approximately $45,000 annually. I currently earn an annual salary of approximately $35,000 with AGD.

18.     Many of the key documents in this case are maintained in my home in Geneva, Illinois. These documents include communications between AGD and Nicor and personnel records concerning my employment with Surveys. On information and belief, Nicor has documents concerning work performed by Surveys, work performed by AGD, and communications with AGD. On information and belief, Nicor maintains these documents at its office in Naperville.

- 5 -

Signed under the penalties of perjury this 3rd day of October, 2004.

                                                                         /s/ Scott Hultine
                                                                         Scott Hultine

**TAB 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT HULTINE, )
 )
    Plaintiff, ) **JUDGE KOCORAS**
 )
v. ) No.
 )
SURVEYS & ANALYSIS, INC., a ) **04C 6248**
Massachusetts corporation, )
 )
    Defendant. ) Jury Demanded

RECEIVED SEP 27 2004 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT

### COMPLAINT    MAGISTRATE JUDGE NOLAN

Plaintiff, Scott Hultine, by his attorneys, states for his Complaint against Defendant, Surveys & Analysis, Inc . ("SAA"), a Massachusetts corporation, as follows:

1.    This action is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and the Portal-to-Portal Act, 29 U.S.C. § 251, *et seq.*, the Illinois Minimum Wage Law, 820 ILCS 105/1, *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.*

### Jurisdiction and Venue

2.    Jurisdiction arises under the provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206, 207, the Portal-to-Portal Act, 29 U.S.C. § 251 *et seq.*, and 28 U.S.C. §§ 1331 and 1367(a). Venue lies in the Northern District of Illinois in that Plaintiff is a resident of this district and Defendants are engaged in business in this district.

### The Parties

3.    Hultine is an individual and former employee of SAA who currently resides in Geneva, Illinois. Hultine resided in Illinois at all times that he was an employee of SAA.

4.    SAA is a Massachusetts corporation with its principal place of business in Shrewsbury, Massachusetts. SAA is engaged in the business of providing leak detection services

to companies in the natural gas industry. As such, SAA's services qualify as an enterprise engaged in commerce as defined by the FLSA.

### Allegations Common to All Counts

5.  Hultine was employed by SAA from on or about March 10, 1997 through on or about July 9, 2002. Throughout Hultine's employment with SAA, he was compensated on an hourly basis. Throughout Hultine's employment with SAA, SAA also paid Hultine a daily flat transportation allowance in addition to an hourly wage.

6.  SAA willfully employed and suffered or permitted Hultine to engage in work for which he was not paid. Most of those unpaid hours should have been compensated at one and one-half times Hultine's regular hourly rate because those unpaid hours, if counted, would have caused the total number of hours worked by Hultine in the workweek to exceed forty. In other instances, those unpaid hours should have been compensated at Hultine's regular hourly rate.

### COUNT I
### VIOLATION OF FAIR LABOR STANDARDS ACT

7.  Hultine realleges and incorporates by reference paragraphs 1 through 6 as paragraph 7 of Count I.

8.  SAA has willfully failed and refused to pay compensation to Hultine as required by the Fair Labor Standards Act and Portal-to-Portal Act for all hours actually worked.

9.  In denying Hultine compensation for all hours worked in a workweek, SAA's actions were not based upon good faith or reasonable grounds.

10. Pursuant to Fair Labor Standards Act and the Portal-to-Portal Act, Hultine is entitled to compensation for all hours worked in any week during the three (3) years preceding the filing of this action.

WHEREFORE, Plaintiff, Scott Hultine, prays for entry of judgment on Count I of his Complaint and that he be awarded (i) his actual wages earned, including overtime; (ii) liquidated damages; (iii) reasonable attorney's fees as provided by statute; (iv) his costs in bringing this action; and (v) such other and further relief that is just and proper.

### COUNT II
### VIOLATION OF THE ILLINOIS MINIMUM WAGE LAW

11. Hultine realleges and incorporates by reference paragraphs 1 through 6 as paragraph 11 of Count II.

12. The Illinois Minimum Wage Law provides that employees must be paid one and one-half times their regular rate of pay for all hours worked in a workweek excess of forty.

13. Throughout the three-year period prior to the filing of this Complaint, the Illinois Minimum Wage Law provided that an employer who fails to pay the required amount of wages due an employee under the law, shall be liable to the underpaid employee or employees for the unpaid wages and for punitive damages in the amount of 2% of the amount of such underpayments for each month following the date of payment during which such underpayments remain unpaid.

WHEREFORE, Plaintiff, Scott Hultine, prays for entry of judgment on Count II of his Complaint and that he be awarded (i) his actual wages earned, including overtime; (ii) punitive damages as provided by statute; (iii) reasonable attorney's fees as provided by statute; (iv) his costs in bringing this action; and (v) such other and further relief that is just and proper.

### COUNT III
### VIOLATIONS OF THE ILLINOIS WAGE
### PAYMENT AND COLLECTION ACT

14. Hultine realleges and incorporates by reference paragraphs 1 through 6 as paragraph 14 of Count III.

3

15. Section 2 of the Illinois Wage Payment and Collection Act (820 ILCS 115/2) provides, in relevant part, as follows:

> For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.

16. Section 4 of the Illinois Wage Payment and Collection Act (820 ILCS 115/4) provides, in relevant part, as follows:

> All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned.

17. Section 5 of the Illinois Wage Payment and Collection Act (820 ILCS 115/4) provides, in relevant part, as follows:

> Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee.

18. Throughout Hultine's employment with SAA, SAA agreed to provide Hultine with paid vacation days, sick days, holidays, and with a daily transportation allowance. At various times throughout Hultine's employment, SAA failed to pay Hultine for all of his sick days, holidays and accrued vacation and all of his daily transportation allowance.

19. SAA's acts as described herein, namely the continuing refusal and failure to pay the earned wages, including without limitation, overtime wages, straight time wages, vacation days, sick pay, holiday pay, and daily transportation allowance to Hultine constitutes a violation of the Illinois Wage Payment and Collection Act.

4

WHEREFORE, Plaintiff, Scott Hultine, prays for entry of judgment on Count III of his Complaint and that he be awarded (i) his wages earned, but not paid; (ii) his costs in bringing this action; and (iii) such other and further relief that is just and proper.

Jury demanded.

SCOTT HULTINE, Plaintiff

By: /s/ Phillip M. Schreiber
One of His Attorneys

David E. Zajicek
Phillip M. Schreiber
Holland & Knight LLP
131 South Dearborn St., 30th Floor
Chicago, Illinois 60603
312/263-3600

# 2263335_v2

TAB B

Westlaw.

Not Reported in F.Supp.2d  
2002 WL 225934 (D.Mass.)  
(Cite as: 2002 WL 225934 (D.Mass.))

Page 1

▷ Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

SYMBOL TECHNOLOGIES, INC., Plaintiff  
v.  
QUANTUM ASSOCIATES, INC., Defendant

No. CIV. A. 01-10983-GAO.

Jan. 30, 2002.

MEMORANDUM AND ORDER

OTOOLE, D.J.

*1 The plaintiff, Symbol Technologies, Inc. ("Symbol"), brought this action against the defendant, Quantum Associates, Inc. ("Quantum"), seeking four declaratory judgments that it did not violate its contracts with Quantum, and making a breach of contract claim against Quantum. In turn, Quantum has moved to dismiss or to transfer venue to the Northern District of California. For the reasons set forth in this memorandum, the defendant's motion to transfer to the Northern District of California is granted.

A. *Summary of Facts*

Symbol is a Delaware corporation engaged in the design, development, manufacture, and sale of "bar code driven transaction systems" such as bar code scanning devices and hand held computers used to track the movement of shipments. Symbol's principal place of business is in Holtsville, New York, but it maintains several locations nation-wide including one in Westford, Massachusetts, and one in San Ramon, California. Quantum is a small software and consulting business that has never had more than one full-time employee. Les Goldner is the owner and President of Quantum.

In 1997, Symbol and Quantum entered into a consulting agreement ("1997 Agreement") pursuant to which Quantum was to develop a stand alone "Cross Dock" software application program which would assist users in tracking the movement of packages and freight. In return, Symbol agreed to help market the Cross Dock software. Schedule D to the 1997 Agreement provided that Symbol "agrees to commit to provide to [Quantum] the minimum revenues per year for software modules and related services .... Should [Symbol] fail to meet the minimums defined in the attached table, [Quantum] has the right to enter into similar marketing relationship with competitors of [Symbol]." The table attached to Schedule D established a revenue minimum of $150,000 for 1998 and $250,000 for 1999. The parties disagree whether the terms in Schedule D obligated Symbol to make payments to Quantum, or whether Schedule D merely created an option for Symbol to extend its exclusive marketing arrangement with Quantum. In 1998, Symbol paid Quantum $150,000, but it declined to make any payments to Quantum for 1999.

In an effort to sell Quantum's software application, Symbol entered into a deal with Staples, Inc. ("Staples") in Framingham, Massachusetts. Staples was interested in the Cross Dock software, but wanted it to be customized to meet Staples's needs. As a result, Symbol and Quantum entered into a second agreement in 1999 ("1999 Agreement") for the development of software which would meet Staples's particular requirements. After some time, Staples decided that it did not wish to proceed with the software Quantum and Symbol were offering and sought another vendor to provide package tracking services. The parties disagree about what caused the Staples deal to fail.

On April 17, 2001, Quantum's attorney sent a letter to Symbol's attorney, Ariel Dvorkis, indicating that Quantum intended to file a legal action against

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 225934 (D.Mass.)
**(Cite as: 2002 WL 225934 (D.Mass.))**

Page 2

Symbol for breach of contract of both the 1997 Agreement and the 1999 Agreement, as well as for several other claims. The letter also stated that Quantum hoped Symbol would choose to settle these claims rather than to engage in litigation. Quantum told Symbol it would wait for twenty-one days for Symbol to respond, and then would file a complaint and initiate legal proceedings. On May 3, 2001, Dvorkis responded to Symbol's letter stating that she had been on vacation when Quantum's letter had arrived, but that Symbol was currently reviewing Quantum's claims and proposals. Dvorkis closed her letter stating that she would "make every effort to gather all the pertinent information and advise [sic] so that I may respond to your letter ASAP." Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss or Transfer Venue, *Dvorkis Aff, Attach. 2.*

*2 Quantum's hopes for an out-of-court resolution were dashed abruptly a month later. On June 8, 2001, Symbol filed this suit against Quantum. As noted, in its complaint Symbol set forth four requests for declaratory judgments regarding Symbol's performance of the 1997 Agreement and the 1999 Agreement, and a claim for damages for breach of the 1997 Agreement. Several weeks later, on July 20, 2001, Quantum filed suit in the Northern District of California against Symbol, claiming for breach of both the 1997 Agreement and the 1999 Agreement, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, and intentional interference with prospective economic advantage, as well as a claim in *quantum meruit.*

Quantum now brings a motion urging that the dispute between it and Symbol is more appropriately resolved through the action in the Northern District of California than through Symbol's action in this court.

B. *Proper Venue*

When parties file similar actions, "the first-filed suit is generally preferred." See *Nortek, Inc. v. Molnar,* 36 F.Supp.2d 63, 69 (D.R.I.1999). But a court may depart from this general preference either when there is "a showing of balance of convenience in favor of the second action" or when "there are special circumstances which justify giving priority to the second." *Id.* 69-70. Whether the court decides to dismiss a case for *forum non conveniens* or to transfer the case to another venue, its decision regarding convenience is guided by concerns of fairness and efficiency, though a motion to transfer is more readily granted. See *Norwood v. Kirkpatrick,* 349 U.S. 29, 32 (1955). As to the second class of exceptions, the First Circuit has not mandated any specific requirements for when such "special circumstances" exist. *Nortek,* 36 F.Supp.2d at 70. However, several district courts have found that indications of forum shopping qualify as special circumstances. See e.g., *Davox Corp. v. Digital Sys. Int'l, Inc.,* 846 F.Supp. 144, 148 (D.Mass.1993); *Bausch & Lomb Inc. v. Alcide Corp.,* 684 F.Supp. 1155, 1159-60 (W.D.N.Y.1987); *Nortek,* 36 F.Supp.2d at 70. Both considerations of convenience and the strong inference that Symbol's action in the District of Massachusetts was an effort at forum shopping lead to the conclusion that this dispute ought to be resolved by the Northern District of California.

Several factors indicate that a California District Court would be a more convenient forum for resolving this dispute. See *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257-61 (1981) (describing factors bearing on the convenience analysis). First, the contracts at issue between the parties are governed by California law, and a California District Court is better equipped to resolve the legal questions posed by this dispute. Second, the bulk of the events which underlie the dispute took place in California. Both contracts were predominately negotiated in California and Georgia, and several of the key players in this dispute live and work in California. Admittedly, Staples's Massachusetts employees may be needed to provide testimony regarding Symbol's and Quantum's performance under the 1999 Agreement. However, these witnesses likely will have little to say about the central question of what the parties agreed to under the 1999 Agreement. The Staples employees' testimony also will not bear on the dispute under the 1997 Agreement. The center of gravity of this dispute both legally and factually is in California, not in Massachusetts. Third, "the balance of convenience focuses on the comparative financial abilities of the parties and the cost of litigation should be borne by the party in the best position to absorb and spread it." *Sigros v. Walt Disney World Co.,* 129 F.Supp.2d 56, 71 (D.Mass.2001). Symbol

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 225934 (D.Mass.)
**(Cite as: 2002 WL 225934 (D.Mass.))**

Page 3

is clearly in a better position to litigate in a distant state than Quantum is, especially since Symbol has offices in the state where Quantum would prefer to litigate.

*3 Symbol's case for keeping the case in Massachusetts is further weakened by the strong indication that its decision to file here is an attempt at forum shopping. Four of Symbol's five causes of action are requests for negative declaratory judgments--that it is *not* liable to Quantum. Courts are aware that plaintiffs at times try to use the Declaratory Judgment Act "to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action." *Great Am. Ins. Co. v. Houston Gen. Ins. Co.,* 735 F.Supp. 581, 586 (S.D.N.Y.1990). A month after Quantum warned Symbol that it planned to file suit for breach of contract, Symbol filed its complaint in this court.

Finally, Symbol's decision to file a complaint when it had given Quantum the impression that it would investigate the possibility of settlement also militates against respecting Symbol's forum preferences. When a potential plaintiff makes a good faith effort to settle a case out of court, courts encourage such efforts and look disfavorably on a party seeking to take advantage of such a plaintiff. *See Davox,* 846 F.Supp. at 148 (citing *Columbia Pictures Indus., Inc. v. Schneider,* 435 F.Supp. 742, 747 (1977)). Dvorkis's letter to Quantum urged Quantum to hold off filing its suit in California while Symbol allegedly investigated the possibility of settlement. Quantum therefore waited for Symbol's out-of-court response to its demands, only to be ambushed by the instant complaint. This conduct further tilts the balance of the equities in favor of letting Quantum proceed in its preferred forum. *See Davox,* 846 F.Supp. at 148-49.

Accordingly, Quantum's motion to transfer venue to the Northern District of California is GRANTED.

2002 WL 225934 (D.Mass.)

Motions, Pleadings and Filings (Back to top)

- 1:01CV10983 (Docket)
                          (Jun. 08, 2001)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT